UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|                              |   |                       |
|------------------------------|---|-----------------------|
| MOSHE GOLDSTEIN,             | : |                       |
|                              | : | Civ. No. 16-8588 (FLW)|
| Petitioner,                  | : |                       |
|                              | : |                       |
| v.                           | : | **OPINION**           |
|                              | : |                       |
| UNITED STATES OF AMERICA,    | : |                       |
|                              | : |                       |
| Respondent.                  | : |                       |

**<u>WOLFSON, Chief Judge</u>:**

## I. INTRODUCTION

Petitioner Moshe Goldstein ("Petitioner") is a federal prisoner proceeding pro se with a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (ECF No. 1.) The Government has opposed the motion. (ECF No. 4.) Petitioner filed a reply. (ECF No. 6.) For the following reasons, Petitioner's § 2255 motion is denied with prejudice and a certificate of appealability will not issue.

## II. BACKGROUND

### A. The Underlying Criminal Proceeding

On October 10, 2013, Petitioner was arrested, along with seven others, pursuant to a superseding criminal complaint (the "Criminal Complaint"), which charged him with one count of conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c). *United States v. Goldstein*, Crim. No. 14-113, ECF No. 4 (D.N.J.). Petitioner's arrest was effectuated at a warehouse in Edison, New Jersey, during the execution of a sting operation by the Government (the "2013 Sting Operation"). *Id.* at 2–3. The 2013 Sting Operation related to the Government's investigation into allegations that Petitioner and the other defendants named in the Criminal Complaint, all of whom

are Orthodox Jewish men, engaged in criminal means to facilitate Orthodox Jewish divorces.

According to the Criminal Complaint, to effectuate an Orthodox Jewish divorce, a husband must provide his wife with a document known as a "get." *Id.* at 4. A get serves as documentary proof of the dissolution of a marriage under Jewish law, and a divorce is not official until a get is given to the wife by the husband. *Id.* Codefendants in this matter, Mendel Epstein, Martin Wolmark, and Jay Goldstein, who were Orthodox Jewish rabbis, were accused of charging *agunah*, women whose husbands would not provide gets, large sums of money to obtain gets from their husbands by means of violence and threats of violence. *Id.* Petitioner was described in the Superseding Complaint as a "tough guy" who would "participate in the actual kidnapping and assault of the recalcitrant husbands to coerce them into giving the get." *Id.* at 5.

On March 10, 2014, Petitioner agreed to waive indictment and pleaded guilty, pursuant to a plea agreement with the Government, to one count of travelling in interstate commerce to commit extortion, a crime of violence, in violation of 18 U.S.C. § 1952(a) and 18 U.S.C. § 2. Crim. No. 14-113, ECF Nos. 125, 127. As part of the plea agreement. both the Government and Petitioner agreed to "waive certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255." Crim. No. 14-113, ECF No. 125, at 4. More specifically, Petitioner agreed to waive "the right to file any appeal, any collateral attack, or any other writ or motion . . . which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level of 24." *Id.* at 9.

While the charge to which Petitioner pleaded guilty related to his involvement in the 2013 Sting Operation, the Government's agreement to not initiate any further proceedings against Petitioner required that a 2011 forced get, in which he also participated, be considered as relevant

conduct for the purpose of sentencing. *Id.* at 2.

The 2011 forced get occurred on August 22, 2011, when six men, including Petitioner, entered the apartment of Usher Chaimowitz and his roommate, Menachem Teitelbaum, to purportedly obtain a get from Chaimowitz. The facts of the 2011 forced get were adduced at trial of certain codefendants in this matter, *United States v. Epstein*, Crim. No. 14-287 (D.N.J.),[1] through testimony from Teitelbaum. (*See* ECF No. 3-1, at 129–50; ECF No. 3-2, at 1–139.) Teitelbaum testified that on August 22, 2011, he awoke to six men in the apartment he shared with Chaimowitz "with a punch to [his] face and [his] teeth being pulled, with [his] arms and legs bound." (ECF No. 3-1, at 147.) Chaimowitz's arms and legs were also bound. (*Id.* at 148.) At some point, Teitelbaum testified that he began to fight the intruders and they pushed his head into a wall and again bound his arms and legs. (*Id.* at 150; ECF No. 3-2, at 1.) At the same time, Teitelbaum testified that the other intruders were "beating up" Chaimowitz and "calling out to him all the time, give a get, give a divorce, to your wife." (ECF No. 3-2, at 2–3.) Teitelbaum was eventually moved to the kitchen and the intruders remained with Chaimowitz for about an hour before leaving the apartment. (*Id.* at 8–9.) After the intruders left the apartment, Teitelbaum testified that he had Chaimowitz take a photo on his cell phone of Teitelbaum while his arms and legs were still bound. (*Id.* at 11–12.) Teitelbaum then took photos of Chaimowitz before calling the Shomrim, the Jewish community police, and the Hatzolah, the volunteer Jewish first aid department. (*Id.* at 13.)[2] Both Teitelbaum and Chaimowitz were taken to the hospital. (*Id.* at 14.)

---

[1] The *Epstein* trial was held between March 3, 2015 and April 21, 2015. *See* Crim. No. 14-287 (D.N.J.).

[2] At trial, Teitelbaum testified that while certain photos were taken immediately following the incident, some were taken after he and Chaimowitz returned home from the hospital and others were taken days after the incident. (*See* ECF No. 3-2, at 14–32.) The issue of when certain

Teitelbaum alleged that four of his teeth were broken result of the incident. (*Id.* at 53.)

Sentencing of the codefendants named in the Criminal Complaint—twelve in total—began in November 2015. Petitioner was the first to be sentenced and during his sentencing hearing, I made some general comments regarding the nature of the crime applicable to each defendant. (ECF No. 3-1, at 112–15.) In weighing the § 3553 factors, I made findings of fact regarding the 2011 forced get, explaining that

> The 2011 incident actually involved not only threats but assaults as well. I heard the testimony of one of the victims, the roommate, Mr. Teitelbaum, of the husband, and I will say here in open court I do not credit all of his remarks which may have been embellished, but there is no dispute that both victims were restrained, tied up, and assaulted in some manner. That is not disputed.
>
> And while the hope may have been to avoid physical harm, that incident, that episode reveals the fact that these situations can escalate, and no one knows how they will actually play out. And as a result, you all go in with the knowledge that force may be used and that the recalcitrant husband may suffer harm, and you go in prepared to deal with that.

(*Id.* at 115–16.) Ultimately, Petitioner was sentenced to a 48-month prison term, below the Sentencing Guidelines range of 51 to 63 months. (*Id.* at 95, 121.)

**B.     The § 2255 Motion**

On November 17, 2016, Petitioner filed the instant motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (ECF No. 1.) Petitioner asserts that he is entitled to relief under § 2255 based on newly discovered evidence confirming that Teitelbaum's testimony at the *Epstein* trial was false. (*Id.* at 5.) Petitioner argues that because this Court partially relied on the testimony of Teitelbaum to determine Petitioner's sentence, he must be resentenced. (*Id.*)

---

photographs were taken was further explored on cross-examination. (*See, e.g.*, ECF No. 4-1, at 102, 105–08; ECF No. 4-2, at 20–23, 41, 63–64; ECF No. 4-3, at 24–26.)

Specifically, Petitioner asserts that photographs admitted at the *Epstein* trial of Teitelbaum tied and bound were taken days after the incident occurred and did not reflect the true "nature and extent of his purported injuries." (*Id.*)

In support of this claim, Petitioner relies upon an affidavit of Testa Shaska (the "Shaska Affidavit"), a private investigator retained on behalf of one of Petitioner's codefendants, Simcha Bulmash.[3] Shaska interviewed Detective Joe Solomon, of the New York City Police Department regarding the 2011 incident. (ECF No. 3-3, at 75.) Detective Solomon was assigned to investigate the 2011 incident. As part of his investigation, Detective Solomon inspected Teitelbaum and Chaimowitz's apartment and interviewed both regarding the incident. (*Id.*) The Shaska Affidavit sets forth the following details which Petitioner asserts is "newly discovered" evidence regarding the veracity of Teitelbaum's testimony:

> 5. Detective Solomon remembered Mr. Teitelbaum's appearance on August 22, 2011 and recalled that Mr. Teitelbaum's face was not "mangled" and he did not appear to be missing any teeth.
>
> 6. Detective Solomon told me that there are no photographs in the NYPD case file related to this incident. Detective Solomon also informed me that, during the first interview of Mr. Teitelbaum on August 22, 2011, he did not present Detective Solomon with any photographs or state that any photographs existed related to the incident.
>
> 7. One of two days after the incident, according to Detective Solomon, Mr. Teitelbaum arrived at the precinct and showed him pictures which Mr. Teitelbaum represented were "recreations" of the crime scene. Detective Solomon told me that he informed Mr. Teitelbaum that he could not include those photographs in the case file because they were not actual crime scene photographs.

---

[3] Petitioner's codefendants, Simcha Bulmash, David Hellman, and Avrohom Goldstein have all filed similar § 2255 motions seeking resentencing based on the Shaska Affidavit. *See Bulmash v. United States*, Civ. No. 16-7885 (D.N.J.); *Hellman v. United States*, Civ. No. 16-8561 (D.N.J.); *Goldstein v. United States*, Civ. No. 16-8587 (D.N.J.).

(*Id.* at 76.) Shaska showed Detective Solomon the photos that were admitted at trial of Teitelbaum and he "confirmed that these photos were the ones that Mr. Teitelbaum showed him . . . and represented to be 'recreations' of the event." (*Id.*)

In its Answer, the Government argues that not only is this evidence not "newly discovered" as this issue came out during the cross-examination of Teitelbaum at trial, even if it were, it would not entitle Goldstein to a new sentence. (ECF No. 4, at 17–24.) The Government also requests that this Court enforce the waiver of appeal and collateral attack rights set forth in Petitioner's plea agreement. (*Id.* at 25–33.)

### III. LEGAL STANDARD

To grant relief on a federal prisoner's motion to vacate, set aside or correct a sentence under 28 U.S.C. § 2255, the Court must find that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "Section 2255 permits relief for an error of law or fact only where the error constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Eakman*, 378 F.3d 294, 298 (3d Cir. 2004) (quoting *United States v. Addonizio*, 445 U.S. 178, 185 (1979)). Accordingly, a petitioner who attacks his sentence "based on some error in the sentencing proceeding [must] allege (1) that the district court received 'misinformation of a constitutional magnitude' and (2) that the district judge relied at least in part on that misinformation.'" *Id.* (citing *United States v. Spiropoulos*, 976 F.2d 155, 163 (3d Cir. 1972)).

"In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth*, 432 F.3d 542. 545 (3d Cir. 2005) (quoting *Gov't of V.I. v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)). A district court "is required to hold an evidentiary hearing 'unless the

motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte*, 865 F.2d at 62.)

**IV.     DISCUSSION**

The Government argues that Petitioner is not entitled to relief under § 2255 because he waived his right to bring a collateral attack motion by entering into the plea agreement. Petitioner asserts that the waiver provision in his plea agreement is not enforceable (1) because it was not made knowingly and voluntarily as Petitioner did not know the extent to which Teitelbaum's testimony was embellished, and (2) because enforcement of the waiver would work a miscarriage of justice.

The Third Circuit has held that "[c]riminal defendants may waive both constitutional and statutory rights, provided they do so voluntarily and with knowledge of the nature and consequences of the waiver." *United States v. Mabry*, 536 F.3d 231, 236 (3d Cir. 2008), *abrogated in part on other grounds*, *Garza v. Idaho*, 139 S. Ct. 738 (2019). This includes the defendant's right to file an appeal or a collateral attack motion under 28 U.S.C. § 2255. *United States v. Fazio*, 795 F.3d 421, 425 (3d Cir. 2015).

A defendant's waiver of his right to file an appeal or collateral attack motion is enforceable so long as it was "entered into knowingly and voluntarily and [its] enforcement does not work a miscarriage of justice." *Mabry*, 536 F.3d at 237. While "a defendant bears the burden of presenting an argument that would render his waiver unknowing or involuntary, a court has an affirmative duty both to examine the knowing and voluntary nature of the waiver and to assure itself that its enforcement works no miscarriage of justice, based on the record before it." *Id.* at 238.

7

### A. Knowing and Voluntary Waiver

The appellate and collateral attack waiver contained in Petitioner's plea agreement is unambiguous—Petitioner agreed to waive his right to file an appeal or collateral attack motion provided he received a sentence at or below the Sentencing Guidelines range. Crim. No. 14-113, at 9. The plea agreement further confirmed that Petitioner had read and understood the agreement, stating, above Petitioner's signature:

> I have received this letter from my attorney . . . . I have read it. My attorney and I have discussed it and all its provisions, including those addressing the charge, sentencing, stipulations, waiver, and immigration consequences. I understand this letter fully. I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties. . . . I want to plead guilty pursuant to this plea agreement.

*Id.* at 6.

The Court confirmed that Petitioner entered into this waiver knowingly and voluntarily during the plea hearing:

> THE COURT: Your plea agreement also provides that under certain circumstances you are giving up your right or waiving your right to file an appeal or collaterally attack the sentence imposed in this case.
>
> Are you familiar with those circumstances?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: I'll ask you some questions in that regard at this time.
>
> Do you understand that the law permits you and the government to file an appeal of your sentence if either you or the government believe that there had been an error?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that you also have a right, if there has been an error, to file a post-conviction challenge to your conviction or sentence?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Do you understand that both you and the

8

government are giving up the right to file an appeal or post-conviction challenge under certain circumstances that are set forth in the plea agreement itself and in Schedule A to the plea agreement.

THE DEFENDANT: Yes, your Honor.

THE COURT: Specifically, do you understand that if I impose term of imprisonment that falls within or below the Guideline ranges that result from a Guideline offense level of 24, you cannot appeal or challenge your sentence?

THE DEFENDANT: Yes.

THE COURT: Do you understand that the United States cannot appeal if your sentence is within or above the Guideline ranges that result from a Guideline offense level of 2$?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand that neither your nor the United States can appeal claiming that I should not have accepted your stipulations in the plea agreement

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you discuss this waiver of appeal and waiver of your right to file for post-conviction relief with your attorney?

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you satisfied with the explanations that he has provided to you?

THE DEFENDANT: Yes, I am.

Crim. No. 14-113, ECF No. 127, at 13–15.

Having reviewed the plea colloquy, the Court is satisfied that Petitioner's waiver of his right to file an appeal or collateral attack waiver was knowing and voluntary. Petitioner affirmed to the Court during the plea colloquy that his counsel had explained to him the consequences of the plea waiver and that he understood those consequences and the consequences of entering into the plea agreement. This is sufficient to confirm that Petitioner's waiver was knowing and voluntary. *See United States v. Khattak,* 273 F.3d 557, 563 (3d Cir. 2001) (holding that a waiver of the right to appeal is knowing and voluntary where the sentencing judge inquired under Federal Rule of Criminal Procedure 11 and as to whether the defendant received a sentence within the

terms of his plea agreement); *Muhammad v. United States*, No. 08-0061, 2010 WL 2771772, at *3 (D.N.J. July 13, 2010); *Colon v. United States,* No. 05-123-2, 2009 WL 37487, at *2 (E.D. Pa. Jan. 5, 2009) (holding that defendant's waiver of his right to appeal or collaterally attack his conviction or sentence is enforceable because there was no support in the record that he acted unknowingly or involuntarily).

Nevertheless, Petitioner asserts that because he did not have the information set forth in the Shaska Affidavit at the time he agreed to plead guilty and entered into the waiver, "he could not have knowingly and voluntarily agreed to [the] waiver." (ECF No. 3, at 27.) Petitioner's argument lacks merit. As the Supreme Court has explained, "the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (emphasis in original); *see also Parry v. Rosemeyer*, 64 F.3d 110, 114 (3d Cir. 1995) ("A plea of guilty will not be found to be unknowing and involuntary in the absence of proof that the defendant was not advised of, or did not understand, *the direct consequences* of his plea." (emphasis added)); *United States v. Romero-Vilca*, 850 F.2d 177, 179 (3d Cir. 1988) (noting that a defendant need not be advised of "collateral consequences" of a plea and defining such a consequence as "one that is not related to the length or nature of the sentence imposed on the basis of the plea"). Indeed, information impeaching a particular witness is not the type of "critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant." *Id.* The fact that Petitioner did not have information that impeached Teitelbaum does not affect the enforceability of the appeal and collateral attack waiver.

Accordingly, Petitioner's appeal waiver is enforceable as knowing and voluntary so long as its enforcement would not work a miscarriage of justice.

**B.     Miscarriage of Justice**

To determine whether a miscarriage of justice would occur as a result of enforcement of a waiver of appeal and collateral attack rights, courts consider, among other things, the following factors:

> [T]he clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result.

*Khattak*, 273 F.3d at 563 (alteration in original) (quoting *United States v. Teeter*, 257 F.3d 14, 25–26 (1st Cir. 2001)). A miscarriage of justice may occur where "enforcing a collateral attack waiver would result in barring an appeal expressly preserved in the plea agreement" or where there are "allegations that counsel was ineffective or coercive in negotiating the very plea agreement that contained the waiver." *Mabry*, 536 F.3d at 243. Moreover, "'[i]t is not enough that an issue [is] meritorious;' after all, appellate waivers are intended to preclude review not just of frivolous questions, but of difficult and debatable legal issues we would otherwise consider." *United States v. Grimes*, 739 F.3d 125, 130 (3d Cir. 2014) (alterations in original) (quoting *United States v. Castro*, 704 F.3d 125, 136 n.6 (3d Cir. 2013)). Courts should employ "a common sense approach" and "look to the underlying facts to determine whether a miscarriage of justice would be worked by enforcing the waiver." *Mabry*, 536 F.3d at 242–43.

To assess the first *Khattak* factor—the clarity and gravity of the alleged error— the Court must briefly comment upon the merits of Petitioner's motion. Petitioner argues that this factor weighs against enforcement of the waiver because "the newly discovered evidence not only

confirms that he should not be believed, and the instant motion provides a means for the Court to remedy the impact of Teitelbaum's false testimony." (ECF No. 3, at 28.) Petitioner additionally argues that "Teitelbaum's lies and the Court's determination of his credibility are significant because the substance of his testimony was a key factor in the Sentencing Court's sentencing determination." (*Id.* at 20.)

A motion for a new trial based on newly discovered evidence will be granted where the following requirements are met:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since trial;
>
> (b) facts must be alleged from which the court may infer diligence on the part of the movant;
>
> (c) the evidence relief on, must not be merely cumulative or impeaching;
>
> (d) it must be material to the issues involved; and
>
> (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Brown*, 595 F.3d 498, 511 (3d Cir. 2010). While the Third Circuit has not determined what requirements must be met to entitle a petitioner to resentencing based on newly discovered evidence, other courts have applied the same factors as for a new trial and substituted the last factor for whether the newly discovered evidence "would probably result [in] a more favorable sentence." *Swiss v. United States*, Crim. No. 08-76, 2008 WL 820269, at *1 (D.N.C. Mar. 20, 2008) (quoting *United States v. Corson*, No. 01-228, 2002 WL 547213, at *3 n.2 (D. Maine Apr. 10, 2002)); *see also Ajemian v. United States*, 171 F. Supp. 3d 206, 211 (S.D.N.Y. 2016) (ordering a hearing on amount of loss based on newly discovered evidence where correction of alleged error would possibly entitle petitioner to a reduced sentence).

First, this Court must determine whether the information contained in the Shaska Affidavit constitutes "newly discovered" evidence. "The test to determine whether evidence is 'newly discovered' is both objective and subjective: Evidence is not 'newly discovered' if it 'was [actually] known or could have been known by the diligence of the defendant or his counsel.'" *United States v. Cimera*, 459 F.3d 452, 461 (3d Cir. 2006). Here, Petitioner argues that the evidence proffered is "newly discovered" simply because it was obtained after the sentencing hearing in this matter. Petitioner further maintains that he acted diligently in obtaining the information because he could not have conceivably known it was necessary to investigate the veracity of Teitelbaum's testimony until this Court, at sentencing, opined that portions of that testimony was potentially fabricated. I disagree. Petitioner was aware that the 2011 forced get would be considered relevant conduct for the purpose of determining his sentence and, thus, it would be necessary for this Court to make findings of fact regarding the conduct underlying that offense. Moreover, Petitioner has not demonstrated that this evidence could not have been discovered prior to either his assent to the plea agreement or the sentencing proceedings. This evidence was readily available. The embellishments in Teitelbaum's testimony were apparent during the *Epstein* trial, which was a matter of public record to which Petitioner had access. Teitelbaum stated multiple times during his testimony that not all the photos he took were taken immediately following the incident but that some were taken "before the hospital, some after the hospital, and some three days later as well." (ECF No. 1-8, at 46.) Petitioner could have obtained this information prior to his sentencing. Simply because Petitioner conducted his investigation post-sentencing and this information is new to him does not render it "newly discovered" for the purpose of obtaining relief under § 2255. *See Cimera*, 459 F.3d at 461.

Equally fatal to Petitioner's argument is the fact that the affidavit does not call into question

any material testimony that was relied upon by this Court at sentencing. The Shaska Affidavit only questions the veracity of two issues: (1) when the photographs of Teitelbaum were taken and (2) the extent of Teitelbaum's injuries. (*See* ECF No. 3-3, at 75–76.) These were not material issues I considered in sentencing Petitioner. Indeed, the affidavit does not call into question the findings the Court made at sentencing regarding the facts underlying the 2011 forced get. Those facts are undisputed: Petitioner and six others entered the apartment of Teitelbaum and Chaimowitz with the intent of obtaining a get from Chaimowitz through the use of threatened and actual force. While the severity of the injuries suffered by Chaimowitz and Teitelbaum was disputed, it was undisputed that certain injuries were suffered. Petitioner admitted to these undisputed facts at his plea hearing before this Court:

> THE COURT: On or about August 22, 2011, did you and a number of co-conspirators go to a residence in Brooklyn, New York?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Did you go to the residence in Brooklyn with the intent of forcing a Jewish man – who I'll refer to as Husband 1 – to give his wife a *get*?
>
> THE DEFENDANT: Yes, I did.
>
> THE COURT: Is a *get* a divorce document, which according to Jewish law, must be presented by a husband to his wife to effect their divorce?
>
> THE DEFENDANT: It is, your Honor.
>
> THE COURT: Did you and your coconspirators intend to physically confine or restrain Husband 1 in order to obtain the *get*?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Did you and your co-conspirators intend to threaten Husband 1 with bodily injury in order to obtain the *get*?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Did you and your co-conspirators, in fact, restrain Husband 1 to obtain the *get*?
>
> THE DEFENDANT: Yes, your Honor.

14

> THE COURT: Did you and/or your co-conspirators, in fact, threaten Husband 1 with bodily injury to obtain the *get*?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Did you and/or your co-conspirators, in fact, injure Husband 1?
>
> THE DEFENDANT: Yes, we did, your Honor.

Crim. No. 14-113, ECF No. 127, at 23–25.

I did not find Teitelbaum's testimony credible and considered only certain aspects of that testimony in sentencing Petitioner and the other defendants involved in the 2011 forced get. The so-called "new" evidence does not alter those findings in any way. At best, the Shaska Affidavit constitutes mere impeachment evidence that goes to Teitelbaum's credibility. This is not enough to entitle Petitioner to a new sentence. *See United States v. Onque*, 169 F. Supp. 3d 555, 581 (D.N.J. 2015) (observing that impeachment evidence is insufficient to demonstrate that testimony given by a material witness was false for the purpose of granting a new trial based on perjured testimony). Because this Court finds Petitioner's basis for relief under § 2255 lacking in merit, the first *Khattak* factor weighs in favor of enforcement of the appellate waiver.

The remaining *Khattak* factors similarly weigh in favor of enforcing of the waiver. The second and third factors—the impact on Petitioner and the Government weigh in favor of enforcement. The impact of enforcing the appellate agreement ensures both Petitioner and the Government receive the benefit of their bargain made by entering in the plea agreement. *See United States v. Abuhouran*, 119 F. App'x 402, 404 (3d Cir. 2005).

Finally, the fourth *Khattak* factor—Petitioner's acquiescence in the result—weighs in favor of enforcement of the appeal waiver. As set forth in detail above, Petitioner "fully acquiesced in the plea agreement and the waiver of his collateral appeal rights." *See Jones v. United States*, No. 13-3748, 2016 WL 81253, at *5 (D.N.J. Jan. 7, 2016). Indeed, by assenting to the terms of the waiver, Petitioner was permitted to plead guilty to the lesser charge of extortion, as opposed to

conspiracy to commit kidnapping. *Accord Mabry v. Shartel*, 632 F. App'x 707, 711 (3d Cir. 2015).

In sum, a miscarriage of justice would not result if the Court enforced the waiver as set forth in the plea agreement. Petitioner has not demonstrated any unusual circumstance which would enable this Court to invalidate the waiver. Indeed, Petitioner's motion "does 'not implicate fundamental rights or constitutional principles'" and his challenge to his below-the-Guidelines range sentence "is precisely the type of appeal his appellate waiver was intended to foreclose." *See Grimes*, 739 F.3d 125, 131 (3d Cir. 2014). Accordingly, Petitioner's § 2255 motion is denied.

## I. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), a litigant may not appeal a final order in a § 2255 proceeding unless the judge or a circuit justice issues a certificate of appealability ("COA"). That section further directs courts to issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* 28 U.S.C. § 2255(d). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In this case, the Court denies a certificate of appealability because jurists of reason would not find it debatable that Bulmash is not entitled to relief.

## II. CONCLUSION

For the foregoing reasons, Petitioner's § 2255 motion is denied with prejudice. Although courts considering § 2255 motions are generally directed to hold evidentiary hearings, it is apparent from the arguments before the Court and the record of the underlying criminal proceeding that, regardless of the evidence adduced at such a proceeding, Petitioner would not be entitled to any relief based on his motion. *See Booth*, 432 F.3d at 545. An appropriate order will be entered.

DATED: May 20, 2019

/s/ Freda L. Wolfson
FREDA L. WOLFSON
US CHIEF DISTRICT JUDGE